UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------- x

             :

UNITED STATES OF AMERICA    :

             :

    - v -     :    22 Cr. 660 (AT)

             :

PHILIP DALLMANN,      :

             :

       Defendant. :

-------------------------------------------------- x

## SENTENCING MEMORANDUM ON BEHALF OF
## PHILIP DALLMANN


       TAMARA GIWA, ESQ.
       Federal Defenders of New York, Inc.
       Attorney for Defendant
       PHILIP DALLMANN
       52 Duane Street - 10th Floor
       New York, New York 10007
       Tel.: (212) 417-8737

       MARTIN S. COHEN
       *Of Counsel*


TO: DAMIAN WILLIAMS, Esq.
   United States Attorney
   Southern District of New York
   One. St. Andrew's Plaza
   New York, New York 10007
   Attn: JANE CHONG, ESQ.
      Assistant United States Attorney

# Federal Defenders
## OF NEW YORK, INC.

Southern District
52 Duane Street, 10th Floor
New York, NY 10007
Tel: (212) 417-8700 Fax: (212) 571-0392

Tamara Giwa
*Executive Director*

Jennifer L. Brown
*Attorney-in-Charge*

June 25, 2024

*By ECF*

Honorable Analisa Torres
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

Re: *United States v. Philip Dallmann*, 22 Cr. 660 (AT)

Dear Judge Torres:

 Philip Dallmann's offense conduct – stealing from his wife, her father, and the non-profit where he worked – is unquestionably serious. It does not follow, though, that the Court *must* impose a term of incarceration. Here, there are several mitigating factors, including Mr. Dallmann's lack of prior criminal history; ███████████████████████████████, which directly contributed to this offense; his recognition of the severity of his conduct and the harms he has caused; his commitment, over the past 20 months, to ████████████████ ████████ and his prospects for the future. Here, intensive supervision, rather than a term of incarceration, will best satisfy *all* the purposes of sentencing.

## I. The standard.

 The overarching command of Section 3553(a) is that sentences should be "sufficient, but not greater than necessary" to achieve the basic goals of retribution, deterrence and rehabilitation. To arrive at such a sentence, district courts are directed to consider: (1) the nature and circumstances of the offense and the history and characteristics of the individual; (2) the need for the sentence imposed to provide just punishment, deterrence, and needed educational and vocational training; (3) the kinds of sentences available; (4) the Guidelines-range and any pertinent policy statements issued by the Sentencing Commission; (5) the need to avoid unwarranted sentence disparities among similarly situated defendants; and (6) the need to provide restitution. *See* 18 U.S.C. § 3553(a). In every case, the sentencing court "must make an individual assessment based on the facts presented." *Gall v. United States*, 128 S.Ct. 586, 597 (2007).[1]

---

[1] The Guidelines-range in this case is 33 to 41 months, based on an offense level of 20 and a Criminal History Category of I. *See* PSR at 27. The Probation Office has recommended a term of imprisonment of 24 months. *Id.*

Honorable Analisa Torres                                                                 Page 2
June 25, 2024

Re:      *United States v. Philip Dallmann*, 22 Cr. 660 (AT)

**II.      The sentencing factors support the imposition of a non-incarceratory sentence.**

> **A.      The nature of the offense and Mr. Dallmann's background and
> characteristics support the requested sentence.**

Philip Dallmann was born in 1988 and grew up in New Jersey. He grew up in a middle-class household with his younger sister, Melissa. Philip was initially close with his sister and parents, but as he grew older his father's conduct became more and more erratic and abusive.



*See* letter of Melissa Dallmann, attached as Exhibit A.

Honorable Analisa Torres                                                     Page 3
June 25, 2024

Re:     *United States v. Philip Dallmann*, 22 Cr. 660 (AT)

Philip's efforts to keep ████████████ hidden from others became a defining pattern in his life: an overwhelming need to present a facade of normalcy and success, regardless of the reality of his situation. This psychological need was so great that it often crossed the line into prevarication and delusion.

In around 2006, Philip began studying at George Mason University, in Virginia. By that time, his father had moved out of the house, and his mother had remarried. According to Philip's mother, Philip was quite distant during his college years. When he did talk to her, he reported that everything was going well, he was on track to graduate, etc. But when it came time to graduate in 2010, and Philip's mother went down for the graduation ceremony, Philip admitted that he had not completed all of the classes necessary to graduate. ████████████████ ████████████████████████████████████████████████████████████

When the façade collapsed, ████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████

In around 2013, Philip moved to New York, where he began working for The Theater Development Fund. In around 2015, he began dating Alexandra Steinberg, and in 2018, Philip began working for Kaiser's Room. Philip and Miss Steinberg were married in 2019.

But while Philip had the outward trappings of a successful young man, the reality was far different. Philip was, in fact, not able to support himself, and so once again he began to lie and delude himself in order to maintain a facade of normalcy. To cover up his lack of income, Philip began using his father-in-law's credit card without authorization, and began to embezzle from his employer, Kaiser's Room. ████████████████████████████████████

In the spring of 2020, Ms. Steinberg discovered the improper use of her father's credit card. The two separated, and eventually entered into a separation agreement under which Mr. Dallmann assumed responsibility for the unauthorized charges, with an agreement that he make payments to Ms. Steinberg of $1,500 per month. Prior to his arrest, Mr. Dallmann had repaid around $31,000. Philip has been unemployed since October 2022, and has thus been unable to continue to make payments. He will start making payments again once he secures employment (and will of course, make restitution to both the Steinbergs and Kaiser's Room.)

In the summer of 2021, Kaiser's Room discovered that Mr. Dallmann had been stealing from the organization. He was suspended and fired. In October 2022, Mr. Dallmann was arrested in this case.

Honorable Analisa Torres                                          Page 4
June 25, 2024

Re:     *United States v. Philip Dallmann*, 22 Cr. 660 (AT)

    1.    *Philip's mental health illness is a contributing factor to the offense.*



    Mr. Dallmann well recognizes that his ████████████ do not excuse his actions, nor do they minimize the severe harms he caused to his ex-wife, her father, Kaiser's Room, and others impacted by his conduct. Mr. Dallmann cannot undo what he has done, but he is committed to treatment, to finding work, and to making restitution. Since his arrest, Mr. Dallmann has applied for a wide variety of jobs. Just in the past year, Philip has applied for over 140 jobs, and has had over 20 interviews with employers, often receiving callbacks for subsequent interviews. Several times, Mr. Dallmann has expected to receive an offer after several very positive interviews, only to learn that he had not gotten the position. It is not surprising that work has been difficult to find: a Google search of Mr. Dallmann's name immediately brings up his arrest in this case.

    Philip's friends and family describe Philip's progress over the past 19 months. As his sister writes, "there are no excuses for what my brother has done but I want to acknowledge that he is working very hard on his mental health." *See* Ex. A. ; *see also* letter of Catherine Kreischer (Philip "has expressed heavy remorse for his actions and continues to work hard in therapy to work through his ████████████"), Ex. B; letter of Maurice Copeland ("Philip has spoken extensively about his regret and the sincere desire to make amends. The case has been a turning point for him, sparling a profound reflection on his life choices and their consequences.", attached as Exhibit C.

    In sum, Mr. Dallmann's background and characteristics strongly support the imposition of a sentence that replaces incarceration with ████████████.

---

[2] Available at: https://www.mountsinai.org/about/newsroom/2021/largest-genetic-study-of-bipolar-disorder-identifies-64-regions-of-the-genome-that-increase-risk-for-the-condition.

Honorable Analisa Torres                                                                 Page 5
June 25, 2024

Re:      *United States v. Philip Dallmann*, 22 Cr. 660 (AT)


**B.      A non-incarceratory sentence will satisfy all the purposes of sentencing.**

Here, I urge the Court to impose a non-incarceratory sentence. Such a sentence is far
better tailored to satisfy *all* the purposes of sentencing than a term of incarceration:

*Punishment*: "When a judge chooses between a prison term and probation, she is not
choosing between punishment and no punishment. Probation is less severe than a prison term,
but both are punishment. And as the Supreme Court has recognized, probation is *significant*
punishment." *United States v. Leitch, et al.*, 2013 WL 753445, at *12 (E.D.N.Y. Feb. 28, 2013)
(emphasis in original) (citing *Gall v. United States*, 552 U.S. 38, 48-49 (2007)). "In addition to
standard and special conditions, there is an array of alternative sanctions—home confinement,
community service, and fines, for example—that allow judges to impose enhanced (and
sometimes even constructive) punishment without sending the defendant to prison." *Leitch*, 2013
WL 753445, at *12.

The Court should also consider the extensive collateral consequences – both formal and
informal – that will attach to this conviction. *See generally United States v. Chevelle Nesbeth*,
188 F. Supp. 3d 179 (E.D.N.Y. 2016) (factoring in collateral consequences when imposing a
non-incarceratory sentence); *see also Utah v. Strieff*, 579 U.S. 232, 253 (2016) (Sotomayor, J.
dissenting) (describing how a criminal record results in the "'civil death' of discrimination by
employers, landlords, and whoever else conducts a background check.").The informal
consequences are often even more severe than the formal ones. The press release distributed by
the Department of Justice upon Mr. Dallmann's arrest – available to anyone with an internet
search engine; that is, all employers –has made it difficult for him to find work now, and will
likely affect his job prospects for years to come.

*Deterrence*: As demonstrated by Mr. Dallmann's conduct over the 30 years preceding
this offense, and his perfect conduct while on pre-trial supervision for almost two years, an
incarceratory sentence is not required to deter him from future criminal conduct. Philip
recognizes the seriousness of the harms he has caused, is committed to treatment, and will never
commit another offense.

Nor is incarceration necessary for the purpose of general deterrence, "a phenomenon that
is notoriously difficult (and perhaps impossible) to measure," see *United States v. Brady*, 2004
WL 86414, at *9 (E.D.N.Y. Jan 20, 2004). Evidence-based studies strongly support the
conclusion that it is the *certainty* of being prosecuted rather than the severity of punishment that
deters crime. *See* Nat'l Inst. of Just., *Five Things About Deterrence*, available at
http://nij.gov/five-things/pages/deterrence.aspx.[3]

---

[3] The National Institute of Justice describes the "Five Things" series as a distillation of "what we
know from years of rigorous scientific inquiry," summarizing an "abundance of research,

Honorable Analisa Torres                                          Page 6
June 25, 2024

Re:      *United States v. Philip Dallmann*, 22 Cr. 660 (AT)

*Incapacitation*: Mr. Dallmann poses no risk to any person, and does not need to be incapacitated. In fact, the opposite is true. Society will best benefit from his remaining in the community, continuing treatment, securing employment, and paying restitution.

*Rehabilitation*: █████████████████████████████
██████████████████████████████

Even before the current staffing crisis, the BOP struggled to provide effective mental health treatment. The Department of Justice's own data indicated that half of the people incarcerated in state and federal prisons reported either current "serious psychological distress" or a history of mental health disorders,[4] and yet, as of 2017, "only 3% of the BOP's sentenced inmate population was being treated regularly for mental illness." Dep't of Justice Office of Inspector General, *Review of the Federal Bureau of Prisons' Use of Restrictive Housing for Inmates with Mental Illness*, at ii (July 2017).[5] The Office of Inspector General noted that after a new mental health policy was implemented in 2014 to increase the standard of care, the number of inmates who received care decreased significantly "because [the BOP] did not have the necessary staffing resources to meet the policy's increased treatment standards." *Id.* at iii; *see also* Christie Thompson, *et al.*, *How the Federal Bureau of Prisons Slashed Care for the Mentally Ill*, The Marshall Project (Nov. 21, 2018) ("A review of court documents and inmates' medical records, along with interviews of former prison psychologists, revealed that although the Bureau of Prisons changed its rules, officials did not add the resources needed to implement them.").[6] As of October 2015, the OIG determined that the BOP "had filled only 57 percent of its authorized full-time Psychiatrist positions nationwide and [] had significant staffing issues with regard to Psychologist positions as well." *OIG Report*, at iii.

The staffing issues have only gotten worse. Because of massive shortages in hiring correctional officers (with 21% of positions remaining unfilled as of March 2023), BOP personnel – including psychologists – who are not correctional officers are being pressed into service as guards. *See* Glenn Thrush, *Short on Staff, Prisons Enlist Teachers and Case Managers*

---

analysis, testing and evaluation." *See* Nat'l Inst. Just., *NIJ "Five Things" Series*, available at: http://nij.gov/five-things/Pages/welcome.aspx.

[4] Jennifer Bronson, et al., *Indicators of Mental Health Problems Reported by Prisons and Jail Inmates, 2011-12*, U.S. Dep't of Just. (2017), available at https://bjs.ojp.gov/content/pub/pdf/imhprpji1112.pdf.

[5] Available at: https://oig.justice.gov/reports/2017/e1705.pdf.

[6] Available at: https://www.themarshallproject.org/2018/11/21/treatment-denied-the-mental-health-crisis-in-federal-prisons

Honorable Analisa Torres                                                                   Page 7
June 25, 2024

Re:      *United States v. Philip Dallmann*, 22 Cr. 660 (AT)

*as Guards*, NY Times (May 1, 2023).[7] According to U.S. Senator Dick Durbin, the president of
the prison union told him that "the BOP has been slow to fill thousands of vacant positions in
correctional facilities, exacerbating the staffing crisis. Without proper staffing, BOP employees,
including case managers, teachers, and psychologists, are pulled from their responsibilities to
perform standard correctional officer duties." *See* U.S. Senate Committee on the Judiciary,
*Durbin Discusses BOP Staffing Crisis with National President of Prison Locals* (Mar. 28,
2023).[8]

        In late 2003, the DOJ Office of the Inspector General conducted an unannounced
inspection of Federal Correctional Institution Sheridan, in Oregon. *See* DOJ OIG, *Inspection of
the Federal Bureau of Prisons' Federal Correctional Institution Sheridan* (May 2024).[9] (FCI
Sheridan is one of the few federal facilities in the Pacific Northwest, where Mr. Dallmann lives.)
The report detailed how staffing shortages negatively impacted the "health, welfare, and safety
of employees and inmates." *Id.* at i.  Among other things, the report documented severe delays in
the provision of basic health care, and routine lockdowns: "As a result [of short-staffing],
inmates must routinely be confined to their cells during daytime hours and are therefore often
unable to participate in in programs and recreational activities." *Id.* at ii. Moreover, "employee
shortages in the Psychology Services and Education departments, as well as the augmentation of
non-custody employees into Correctional Officer posts, created significant backlogs for inmate
programs." *Id.* at 13.[10]

        The lack of resources for psychological services in the Bureau of Prisons is borne out by
the anecdotal reports of our clients. Even in cases where the presentence report was replete with
descriptions of serious mental health disorders, our clients do not receive treatment beyond the
provision of psychotropic medications, and their symptoms frequently worsen during their terms
of incarceration.

█████████████████████████████████████████████████████████████████████

               strongly supports the imposition of a sentence that substitutes supervision and

---

[7] Available at: https://www.nytimes.com/2023/05/01/us/politics/prison-guards-teachers-
staff.html.

[8] Available at: https://www.judiciary.senate.gov/press/dem/releases/durbin-discusses-bop-
staffing-crisis-with-national-president-of-the-council-of-prison-locals.

[9] Available at: https://oig.justice.gov/sites/default/files/reports/24-070_0.pdf.

[10] In addition to short-staffing, the report describes a chronically underfunded facility that cannot
provide basic services. Just to take one example, "due to what the BOP's Western Region Chief
Dentist described as a critical shortage of dental supply items . . . inmates could not receive
routine care such as teeth cleaning, cavity filling, or root canals. . . . As of October 2023,
approximately 350 inmates were on a waitlist for routine dental care, 41 percent of whom had
been on the waitlist for 2 years or more." *See id.* at 11.

Honorable Analisa Torres                                                                  Page 8
June 25, 2024

Re:      *United States v. Philip Dallmann*, 22 Cr. 660 (AT)

treatment for extensive incarceration. *See* 18 U.S.C. § 3553(a)(D) (court must consider need of
the sentence imposed to provide medical care in *the most effective manner*).

     *Promoting Respect for the law*: By replacing extensive incarceration with intensive
supervision. our requested sentence best satisfies all the purposes of sentencing Such a sentence
fundamentally promotes respect for the law, because it is well-tailored to this offense and to Mr.
Dallmann's unique characteristics.

* * *

     Philip Dallmann recognizes the severity of his offense, and the serious harms he has
caused to others. Philip does, though, have many positive qualities, and has much to offer. He
has demonstrated over the past 20 months that he can succeed under supervision, and that he
does not need to be incarcerated for any purpose. Here, I urge the Court to impose a non-
incarceratory sentence, to be followed by a three-year term of supervised release, with special
conditions including ███████████████████

                            Respectfully submitted,

                            /s/_____

                            Martin S. Cohen
                            Ass't Federal Defender
                            Tel.: (212) 417-8737

Cc.      Jane Chong, Esq. by ECF

Exhibit A

Judge Torres,

My name is Melissa Dallmann and Philip Dallmann is my brother.





There are no excuses for what my brother has done but I want to acknowledge that he is working very hard ▓▓▓▓▓▓▓▓▓▓ . I am asking for some leniency with your sentencing so that my brother can continue to improve. I am forever grateful for Philip and all the sacrifices he made to protect me. Thank you.

Melissa Dallmann

Exhibit B

Judge Torres,

My name is Catherine Kreischer and my son is Philip Dallmann. I am here to write this letter to tell you about my son. I have worked hard to raise Philip to be a caring, loving person.

Family was always an important part of his life. His cousins, Aunts, and Uncles would meet every Friday night at his grandparents' house for "pizza Friday" to gather and catch up on the week and bond with each other.

I am a nurse. When Philip was young, I worked every weekend and his dad watched Philip and his sister. Unfortunately, my schedule had to change due to his father being laid off. I worked full time 3-11 to cover the family's health insurance. Philip was asked to step up to the plate and do things like make sure dinner was put in the oven and keep an eye on his sister.

At the age of 9, Philip was diagnosed with Celiac disease. This was treated by a strict dietary restriction. At times, this caused him to be embarrassed and teased by his friends and classmates.



Philip has always had a passion for helping those in need. In High School, he created the first talent show to raise money for cancer awareness. His great aunt Mamie passed away from breast cancer which impacted him greatly.



I understand that Philip has to take responsibility for his actions and the lives that were affected by his actions. I am asking that you have some leniency on the sentencing for my son as he is working hard to repair the damage that has been done.

███████████████ has been a more prominent presence in his family's lives out in Seattle where he is currently residing. He has expressed heavy remorse for his actions and continues to work hard ██████████████████████████████████. I believe that my son is a good person, a good son, a good friend and a good brother and I hope through this letter you are able to see that person too. I hope you consider leniency in your sentencing. Thank you for taking the time to read this letter.

Sincerely,
Catherine Kreischer

Exhibit C

6/6/2024

Dear Judge Torres,

My name is Maurice Copeland, and I am writing to express my strong support for my long-time friend, Philip Dallmann. Philip and I have been friends since middle school, a bond that has endured over many years and through various life changes. I have had the privilege of witnessing Philip's growth and development, both as an individual and as a member of our community.

Philip and I shared many formative experiences during our middle school years, a time when friendships are solidified by shared adventures and challenges. I vividly recall an incident when a fellow classmate was struggling with bullying. Philip, always attuned to the needs of others, stepped in to support this classmate, providing a sense of safety and belonging.

Philip has faced significant hardships throughout his life, which have profoundly shaped his character. One of the most impactful experiences was the loss of his father during his teenage years. Now, Philip's father did not pass away, in fact, he is alive and thriving today.  His father did however leave his family, to move onto to other endeavors, leaving a space where guidance and support was needed.  This struck Philip deeply, leading to a period of profound grief and emotional turmoil. Despite the immense pain, Philip showed remarkable resilience. He dedicated himself to supporting his family, especially his younger sister, often putting their needs before his own. This period of his life highlighted his strength and ability to persevere in the face of adversity.

The current situation has had a profound emotional impact on Philip. He has expressed deep remorse for his actions, acknowledging his mistakes and the pain they have caused. In our conversations, Philip has spoken extensively about his regret and the sincere desire to make amends. This case has been a turning point for him, sparking a profound reflection on his life choices and their consequences. The weight of this experience has not only affected Philip but has also deeply impacted his family and loved ones, who have been supportive yet heartbroken over the situation.

While in conversations with Philip during this time, he has shared with me his aspirations for the future, which include getting a job to be able to support himself again.  His determination to rebuild his life is evident, and I am committed to supporting him in these endeavors. I plan to assist Philip in finding opportunities and potential job placements, ensuring he has a stable foundation to rebuild.

In conclusion, while Philip has made mistakes, his deep remorse and commitment to change are undeniable. He has faced significant hardships with resilience and has a clear vision for a positive future. I wholeheartedly support Philip in his journey toward redemption and am confident in his ability to make meaningful contributions to society once again.

Thank you for considering my letter of support.

Sincerely,

Maurice Copeland

Exhibit D

Dear Judge Torres

This correspondence is a letter of support for our nephew, Philip Dallmann.  Philip is the son of my wife's brother and, though we live in Washington state and Philip was raised in New Jersey, our families have always been close in our relationships.  As a result, we had the chance to watch Philip grow as we would see him on our trips to the East Coast as well as when he came with his family to visit us on the West Coast.

Philip was always a quiet, almost shy child who seemed to get along with our three girls as well as his two older male cousins in NJ.  After his grandfather, my father-in-law, had a stroke, we heard many stories about how attentive and helpful Philip was, visiting with him and being present by his side.

As time went on, it became apparent that Philip had developed a strong attachment to our part of the country – he rooted for our sports teams, especially the Mariners and the Seahawks, and even talked about living here one day.  Perhaps in a move that would be a chance to start over, Philip moved to Seattle in the summer of 2021.

By this time, our PNW family had grown beyond just my wife and me.  We have two of our three girls living nearby, one being married with two kids of her own.  Philip immediately became part of our family gatherings – usually a Sunday dinner with all eight of us.  He fit right in, sharing in our conversations and expressing his gratitude for the support we offered as he transitioned here.  He has been especially attentive to our two grandchildren, his second cousins, who live in Seattle, going to their baseball, basketball and soccer games, remembering them on birthdays, attending their baptisms and even including them in the family's March Madness bracket pool which he set up.

Despite this closeness, none of us were aware of the issues that resulted in Philip's arrest in the fall of 2022.  We found it impossible to have very meaningful conversations with the two young kids around and decided that it might be best to have a period of separation until the adults could figure out how to handle this.

And then COVID made a comeback and we found our family separating from each other once again.

Philip has expressed how isolated he felt as those months went by.  He found himself unemployed as a result of, I suspect, his legal problems becoming known to his employer.  With no other means of support, we were aware of how he was struggling.  We tried to help with gift cards and by dropping off meals at his apartment but he no longer had a strong network to rely on.  We encouraged him to seek professional help and were told that he had gotten medical and psychological assistance.

Once the threat of COVID subsided again, we gradually resumed our family gatherings – outside at first because of our continuing health precautions.  By now, I think we've returned to the norm of having Philip as part of our gatherings and in our lives.

We are aware that he returns to the East Coast for sentencing in a few weeks.  We realize that accountability is what is at stake here.  We hope that you will take into consideration Philip's struggles with his own mental health, the impact that his arrest has had on his ability to be gainfully employed, the turmoil that the pandemic generated, but, most importantly, the efforts that have been made to re-establish trust and to provide a network of support during all of this.

Thank you for your consideration.

George and Eileen Treusch

Exhibit E