**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Jacob K. Javits Federal Building*
*26 Federal Plaza*
*New York, New York 10278*

July 2, 2024

**BY ECF**

The Honorable Analisa Torres
United States District Judge
Southern District of New York
500 Pearl Street
New York, NY 10007

**Re: *United States* v. *Philip Dallmann*, 22 Cr. 660 (AT)**

Dear Judge Torres:

The Government respectfully submits this letter in advance of the July 8, 2024 sentencing of defendant Philip Dallmann.

Dallmann is a serial fraudster. As the executive director of a not-for-profit service organization committed to improving the lives of children with varying developmental profiles (the "Victim Not-for-Profit"), for years Dallmann abused his position by systematically embezzling donations intended for the betterment of children—almost $100,000—and thereby jeopardized the organization's very existence. Not content to defraud the Victim Non-for-Profit, Dallman also defrauded his family. In part to cover up his crimes, Dallmann stole almost $200,000 from his wife—a teacher at the Victim-Not-for-Profit whom Dallmann conned into marriage by faking that he had cancer—and from her father. Finally, Dallmann impersonated the Victim Not-for-Profit's treasurer in order to trick the organization into agreeing to pay his wife back for Dallmann's own personal expenses. And when his victims confronted him about his crimes, Dallmann repeatedly lied.

Dallmann's extraordinary deceit calls for a substantial sentence. For the reasons set forth below, the Government submits that a sentence at the top of the U.S. Sentencing Guidelines ("U.S.S.G." or "Guidelines") range of 33-41 months is sufficient, but not greater than necessary, to serve the purposes of sentencing.

## I. Offense Conduct

In 2018, Dallmann began serving as the executive director of a Manhattan-based nonprofit organization dedicated to providing inclusive arts programming to autistic and developmentally delayed children (the "Victim Not-for-Profit"). (Presentence Investigation Report ("PSR") ¶ 10). The position included a variety of duties, including responsibility for disbursements of donor funds. (*Id.*). In his position, Dallmann was an authorized user of a bank

account, held at a bank in Manhattan into which funds from donors were regularly deposited and from which the Victim Not-for-Profit paid its operating expenses. (*Id.* ¶ 11). Both Dallmann and the founding director (the "Founding Director") had access to the bank account, but Dallmann was responsible for using it to manage day-to-day operational expenses. (*Id.*). In the summer of 2019, the Founding Director learned that the Victim Not-for-Profit had received overdraft notices from the bank. Dallmann blamed the bank for losing donor checks deposited into the organization's account, resulting in a shortage of funds. (*Id.*). Dallmann then arranged to switch banks, and opened an account for which he was the sole day-to-day user with access to the account (*Id.* ¶ 12).

Later auditing by the Victim Not-for-Profit confirmed that Dallmann began systematically stealing from its accounts since before the bank switch, and that Dallmann's theft had caused the shortage of funds.[1] (*Id.* at 8). Dallmann continued stealing from the second bank account until his termination in mid-2021. All told, he used the Victim Not-for-Profit's accounts for hundreds of unauthorized personal transactions, including payments for pet grooming, food delivery, restaurants, groceries, alcohol, clothing, shoes, transportation, ESPN Plus and Netflix subscriptions, Amazon orders, and wedding photography services. (*Id.* ¶ 16).

Dallmann's fraud did not end there. While serving as an executive director for the Victim Not-for-Profit, he also dated and married a woman who subsequently served as a dance teacher employed by the organization ("Individual Victim-1"). (*Id.* ¶ 13). As described in Individual Victim-1's impact statement, *see id.* at 10,[2] the deceit began from the very beginning of their relationship, when Dallmann pretended he had cancer and manipulated Individual Victim-1 into handing over her savings. After Individual Victim-1 began teaching at the Victim Not-for-Profit, she and Dallmann were married. Unbeknownst to Individual Victim-1, Dallmann then began using her credit cards without her permission, which were linked to accounts belonging to her father ("Individual Victim-2"). By stealing from Individual Victim-1 and Individual Victim-2, Dallmann was also able to cover certain shortfalls in the Victim Not-for-Profit's account—shortfalls that Dallmann himself had created through his routine embezzlement.

When, in the spring of 2021, Individual Victim-1 confronted Dallmann about the credit card charges, he again lied and claimed he had used the money on behalf of the Victim Not-for-Profit. Based on these lies, in May 2021, the Victim Not-for-Profit entered into a contract to pay Individual Victim-1 approximately $30,000. (*Id.* ¶ 14). To finalize this contract, Dallmann impersonated the Victim Not-for-Profit over email in exchanges with Individual Victim-1. (*Id.* ¶¶ 14-15).

---

[1] The Not-for-Profit Victim has submitted a victim impact statement (included in its entirety on pages 8-9 of the PSR) and a statement of losses, which are being submitted in partially redacted form as Exhibit A.

[2] Individual Victim-1 and Individual Victim-2 have submitted written victim statements (included in their entirety on pages 10-13 of the PSR) and a statement of losses, which are being submitted in partially redacted form as Exhibit B.

In his plea agreement, Dallmann agreed to restitution in the amount of $259,088.70, based on the Government's understanding from the victims that Dallmann stole $97,958.62 from the Not-for-Profit Victim and $161,130.08 from his wife and her father. (PSR at 29).[3]

## II. Procedural History and Applicable Guidelines Range

### A. Information and Plea

On December 7, 2022, Dallmann was charged by information with wire fraud, in violation of 18 U.S.C. § 1343 (Count One), access device fraud, in violation of 18 U.S.C. § 1029(a)(5) (Count Two), and aggravated identity theft, in violation of 8 U.S.C. § 1028A(a)(1) and (b).

On January 30, 2024, pursuant to a plea agreement, the defendant pleaded guilty to Counts One and Two of the Information. (PSR ¶ 6). As set forth in the plea agreement, the parties have stipulated that the offense level is 20, based on a base offense level of 7, a 12-level enhancement because the loss was between $250,000 and $550,000, a 2-level enhancement because the offense involved a substantial financial hardship to at least one victim, a 2-level enhancement because the offense involved a misrepresentation that the defendant was acting on behalf of a charitable organization, and a 3-level reduction for acceptance of responsibility. The parties also stipulated that the defendant is criminal history category I, which results in a Guidelines range of 33 to 41 months' imprisonment ("Stipulated Guidelines Range").

The U.S. Probation Office ("Probation") calculated the same offense level, criminal history category, and Guidelines range and recommends a sentence within the Stipulated Guidelines Range. (*Id.* ¶ 70).

## III. Discussion

### A. Applicable Law

The Guidelines still provide important guidance to the Court following *United States* v. *Booker*, 543 U.S. 220 (2005), and *United States* v. *Crosby*, 397 F.3d 103 (2d Cir. 2005). Indeed, although *Booker* held that the Guidelines are no longer mandatory, it also held that they remain in place and that district courts must "consult" the Guidelines and "take them into account" when sentencing. *Booker*, 543 U.S. at 264. As the Supreme Court stated, "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range," which "should be the starting point and the initial benchmark." *Gall* v. *United States*, 552 U.S. 38, 49 (2007).

After that calculation, however, a sentencing judge must consider seven factors outlined in Title 18, United States Code, Section 3553(a): (1) "the nature and circumstances of the offense and the history and characteristics of the defendant"; (2) the four legitimate purposes of sentencing, as set forth below; (3) "the kinds of sentences available"; (4) the Guidelines range itself; (5) any

[3] The Government understands that the Not-for-Profit Victim has since adjusted its loss amount downward and the two individual victims have SINCE adjusted their loss amount upward, as reflected in Exhibits A and B. Prior to sentencing, the Government will submit a restitution order reflecting the final loss amounts.

relevant policy statement by the Sentencing Commission; (6) "the need to avoid unwarranted sentence disparities among defendants"; and (7) "the need to provide restitution to any victims," 18 U.S.C. § 3553(a)(1)-(7). *See Gall*, 552 U.S. at 50 & n.6.

In determining the appropriate sentence, the statute directs judges to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are:

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
(B) to afford adequate deterrence to criminal conduct;
(C) to protect the public from further crimes of the defendant; and
(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).

**B. The Defendant Should Serve a Guidelines Sentence.**

This is a case involving a systematic, elaborate, years-long fraud, perpetrated by a defendant who abused his position of trust to embezzle funds intended for developmentally delayed children and stole from his own family members. The 3553(a) factors strongly weigh in favor of a sentence of 41 months' imprisonment.

First, the nature and circumstances of Dallmann's crimes call for a sentence at the top of the Stipulated Guidelines Range. *See* 18 U.S.C. § 3553(a)(1). In particular, the planned and predatory aspect of the defendant's years-long scheme and the devastation he caused his victims deserve close consideration in determining the appropriate sentence in this case. For years, the defendant systematically deceived the not-for-profit organization that he was entrusted to serve as the executive director, stealing donor funds intended for developmentally disabled children and using them for a full range of personal expenses, from pet grooming to ESPN Plus and Netflix subscriptions. (*Id.* ¶ 16). When the organization discovered his embezzlement—not because he confessed but because he went so far as to impersonate the organization's treasurer over email—the organization was plunged into turmoil. As the Founding Director wrote in his victim impact statement:

> We canceled our cherished classes and upcoming performances because we were not able to pay our teachers. The children were left without explanation as to why their favorite activities were no more; there was no place to dance, act, or try their hand at musical theater after all the work that had been done to pivot to virtual programming during the COVID pandemic. It's not as though there are many other organizations providing similar services – a safe, theatrical environment – for developmentally disabled children, especially in the midst of a global pandemic. Our classes are unique, but our bank

> accounts had been overdrawn. There was nothing we could do. Mr. Dallmann left us with nothing except reputational damage.

(PSR at 9; *see also* Es. A). In addition to canceling its programming, the Victim Not-for-Profit halted donations and took out bridge loans. (*Id.*). The organization was forced to do so because Dallmann stole an enormous share of its revenue. In 2022, the organization's revenue was approximately $120,000, (PSR at 9; *see also* Ex. A); in the three years Dallmann served as executive director, he stole almost $100,000.

Dallmann engaged in similarly extreme forms of deception to steal almost $200,000 from his then-wife, a teacher employed by the Victim Not-for-Profit, and her father. As his ex-wife detailed in her victim impact statement, Dallmann did not merely steal her credit cards for personal use, but also falsely communicated to her family that she had admitted to having a spending addiction and worked to isolate her from others to protect his scheme, and silenced emails in her email inbox so that she would not receive notifications from her bank about credit card collections. (PSR at 11; *see also* Ex. B). Far from anomalous, these actions formed part of a pattern that characterized their entire relationship, beginning with his falsehoods about having cancer. (PSR at 10). As a result of Dallmann's extravagant deceptions, Victim-1, Individual Victim-2, and their family suffered losses that must be measured not only in dollars but also in time, emotional anguish and psychological distress. Individual Victim-1 suffers from post-traumatic stress disorder, anxiety and depression due to Dallmann's manipulations. And her father, Individual Victim-2, writes of the sorrow Dallmann caused his family and the great damage Dallmann inflicted on his mental wellness, as well as on his credit and retirement plans.

Notably, Dallmann attempted to deceive both the Victim Not-for-Profit and his then-wife even after being confronted about his conduct. As the Founding Director detailed in his victim impact statement, Dallmann initially lied and claimed he had accidentally used the organization's card for personal charges and promised to grant the organization's treasurer access to the bank account from which he had been siphoning funds. Instead, among other things, Dallmann gave the organization and its pro bono lawyers incorrect passwords and prevented the organization from accessing its own account. (PSR at 9; *see also* Ex. A). In the same way, when his wife confronted him about his expenditures, Dallmann lied and claimed he had used her credit cards to cover expenses for the organization, then going so far as to convince the organization to enter into a $30,000 repayment contract with her and impersonating the treasurer to finalize and then modify the repayment schedule. (PSR ¶ 14).

The defendant argues that he should receive a non-incarceratory sentence based on purported mitigating factors, namely, personal challenges he has faced over the course of his life. This argument should be rejected. His personal history in no way explains or begins to excuse his serial and increasingly elaborate deceptions, which lasted for years, not days or months. The defendant must face consequences for his conduct, and in this case, just punishment is a significant term of incarceration. It should also be noted that Dallmann's actions were not those of a desperate man in need of money to live. This is apparent from the hundreds of unauthorized expenses he incurred using funds belonging to the organization, his wife, and his father-in-law, which included everything from entertainment expenses, such as Netflix and ESPN subscriptions, to food deliveries, to wedding photographer expenses. (Exs. B, D). Dallmann

embezzled funds intended for children and spent other people's money not because he lacked options but because it was easy and convenient for him to do so, whatever the cost to the victims.

Lastly, a Guidelines sentence is necessary to achieve a just outcome in this case and to deter the defendant—and others like him who seek to deceive and hurt others—from committing crimes of fraud. This is a case involving an individual who has demonstrated a willingness to lie and steal because it served him, despite alternatives, and without consideration for the harm done to numerous others. He not only took his victims' money, but he destroyed their trust. The lasting psychological damage he has done to these individuals, many of whom trusted him personally as well as professionally, cannot be understated. *See United States v. Kilkenny*, 295 F. App'x 396, 399 (2d Cir. 2008) (above-Guidelines sentence was reasonable where the district court noted, among other things, that a number of the defendant's victims were close family member and friends).

Ours is a single criminal justice system, designed to mete out outcomes that are proportional to the crime and to foster respect for the law. The nature and circumstances of the defendant's offense, and the need to promote respect for the law, to provide just punishment, to protect the public, and to deter future criminal conduct all weigh in favor of a sentence at the top of the Stipulated Guidelines Range.

**C. Conclusion**

For the reasons set forth above, the Government respectfully requests that the Court impose a sentence of 41 months' imprisonment. This sentence would be sufficient but not greater than necessary to serve the legitimate purposes of sentencing.

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York

By: ______________________________
Jane Chong
Assistant United States Attorney
(917) 763-3172

cc: Martin Cohen, Esq. (via ECF)